NO. 07-08-0351-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

NOVEMBER 25, 2009
_____

CRAIG TAFT AND SYLVIA TAFT, APPELLANTS

V.

DONALD S. SHERMAN AND ELSA SHERMAN, APPELLEES
_____

FROM THE 69TH DISTRICT COURT OF DALLAM COUNTY;

NO. 10,788; HONORABLE RON ENNS, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**OPINION**

Appellants, Craig Taft and Sylvia Taft (Taft), appeal the granting of two partial summary judgments and final judgment against them and in favor of appellees, Donald S. Sherman and Elsa Sherman (Sherman). We will affirm the judgment of the trial court.

Factual and Procedural Background

In 2005, Sherman was operating a dairy in California. That year, Sherman began investigating the possibility of relocating his dairy operation to Dallam County, Texas. To

that end, he visited the area around Dalhart. Ultimately, in that same year, Sherman decided to purchase two tracts of land in Dallam County. One of the tracts was owned by Maxine Taft Scott, the mother of Craig Taft. The second property was owned by Craig Taft. Initially, a letter of intent was executed by Donald Sherman as buyer and Craig Taft as owner/agent. Paragraph 17 of the letter of intent provides that, "It is the desire and intent of the parties to enter into a feed supply agreement where by [sic] seller shall have the first right to provide feed grown on the purchased and optioned properties to the buyer. This could also include a lease back agreement and or a [sic] agreement to custom farm for buyer." The letter of intent was signed on October 10, 2005. Subsequently, the record reflects that Scott desired to close the purchase of her property before Sherman would be able to sell their dairy in California and be prepared to commence dairy operations in Texas. To effectuate the total transaction, Scott's land was sold to Taft, as nominal owner, and the purchase was funded by Sherman. This led to the execution of two Option and Purchase Agreements. The first, hereinafter termed "Option 1," covered the land initially owned by Scott. That agreement was executed by the parties on December 30, 2005. The second, hereinafter termed "Option 2," covered the land owned by Taft and was also executed on December 30, 2005. The use of the option contracts was to effectuate Sherman's tax free exchange of his dairy in California for the one in Texas. As part of the overall plan, a contract to build the dairy in Texas was entered into on May 30, 2006. This agreement provided that the dairy would be built on the "Option 1" property by Taft, with Taft's performance guaranteed by Sherman. In other words, Taft would allow the dairy to be built and Sherman would pay for the construction. Again, this was done to effectuate the overall plan of situating Sherman for a tax free exchange of his California property for

2

the Texas property. The testimony at the injunction hearing revealed that the "Option 2" property was required in order to ensure that Sherman had enough land to produce feed for the dairy herd. Both "Option 1" and "Option 2" contained language similar to the language contained in paragraph 17 of the letter of intent. Paragraph 16 of the "Option 1" contract stated,

> The parties will use their best efforts to negotiate concerning a feed supply agreement pertaining to the First Option Property and the Second Option Property and/or a lease agreement or agreement for custom farming.[1]

The language expressed in paragraph 17 of the letter of intent, paragraph 16 of "Option 1," and paragraph 15 of "Option 2" was insisted on by Taft and both the option documents were drafted by Taft's attorney.

Eventually, Sherman spent approximately $9 million on the construction of the dairy. The dairy was completed on May 1, 2007. In November 2007, Sherman identified a purchaser for the dairy in California. Donald Sherman testified that the sale of the dairy in California was ready to be closed by late December 2007 and, because of that, he informed Taft that there was a need to close the purchases of the "Option 1" property some time after January 1, 2008. According to Sherman's testimony, Taft's only comment was, "We'll get it done." Prior to the January 2008 conversation with Taft, Sherman had received two proposed real property leases for all of the farm land in question. The testimony at trial revealed that Taft's lawyer drafted the proposed leases. Under the terms of the proposed leases, Taft would farm all of the land in question. Sherman never

---

[1] The "Option 2" contract contained the same language in paragraph 15.

executed the leases. In December 2007, Sherman testified that he had a conversation with Taft regarding the farming of the "Option 1" land for the upcoming year. Sherman testified that, in that conversation, he advised Taft that the Shermans would be farming the land and that Taft said nothing when so informed.

By February 25, 2008, the "Option 1" property was ready to be closed. The testimony at the injunction hearing revealed that, when Taft's original attorney, Bill Hunter, was contacted about the closing, Hunter informed Sherman's attorney, Robert Triebsch, he was no longer representing Taft and that Triebsch would be hearing from a new attorney. A few days later, Triebsch received a call from Taft's new lawyer advising that Taft would not sign the closing documents because Sherman had not signed the lease agreement. Sherman filed his original suit on March 18, 2008, asking for specific performance on the two option contracts and requesting the issuance of a mandatory injunction requiring Taft to close the sale of the two properties at issue. By a letter dated April 4, 2008, Taft's attorney instructed Sherman to cease farming operations on the "Option 1" property. Taft filed his answer to the specific performance suit on April 23, 2008, asserting that, under the "best efforts" clause of the option contracts, Sherman had waived or forfeited their rights to exercise the options to purchase both tracts of land.

On April 24, 2008, Sherman filed an application for temporary injunction, essentially requesting that the trial court place them back in possession of the "Option 1" property and allow them to continue farming operations. A hearing on the injunction was held on May 7, 2008, and the trial court granted the injunction.

4

Sherman filed the first motion for partial summary judgment on May 6, 2008. This was a traditional motion for summary judgment filed pursuant to Texas Rule of Civil Procedure 166a(c).[2] See TEX. R. CIV. P. 166a(c).[3] The motion alleged that Sherman was entitled to summary judgment on Taft's defense of waiver and forfeiture because the defense was based on the contractual language that best efforts would be made to negotiate a feed supply agreement and/or a lease. Sherman alleged that such agreement is, as a matter of law, unenforceable. Taft subsequently filed a supplemental answer alleging that he was fraudulently induced into executing the option contracts because Sherman had promised that Taft could farm the two tracts of land "for a period of time" following the closing of the sales. On May 15, 2008, following the hearing on Sherman's request for an injunction, the trial court entered an order granting a temporary injunction. The trial court's order placed Sherman back on the "Option 1" property and Taft was ordered to desist and refrain from taking any action that would interfere with Sherman's ability to occupy and operate the property. Subsequently, Taft filed a response to Sherman's first motion for summary judgment which asserted that Taft had been fraudulently induced to sign the various documents agreeing to the transfer of the properties at issue. As summary judgment proof, Taft referred to the temporary injunction testimony of Donald Sherman, Richard Avila, Robert E. Triebsch, and Craig Taft. The trial court did not immediately make a ruling on the first motion for partial summary judgment.

---

[2] Appellees' brief refers to a traditional motion for summary judgment under Rule 166a(d), however this appears to be a typographical error as it is clear that they mean pursuant to Rule 166a(c).

[3] Further reference to the Texas Rules of Civil Procedure will be by reference to "rule ___."

5

Sherman then filed a second motion for partial summary judgment on June 23, 2008, alleging that Taft's fraudulent inducement defense failed for two reasons. First, Sherman contends that the element of justifiable reliance on any oral representations allegedly made is not present. Second, Sherman contends that the alleged oral promise is barred by the statute of frauds. See TEX. BUS. & COMM. CODE ANN. § 26.01(a)(1), (b)(5) (Vernon 2005).[4] As summary judgment proof, Sherman submitted many of the exhibits and much of the testimony from the temporary injunction hearing. On July 10, 2008, Taft filed his response to the second motion for partial summary judgment which resubmitted the proof submitted to counter the first motion and made legal arguments regarding that evidence.

Sherman subsequently filed a first amended petition and a third and fourth motion for partial summary judgment. These subsequent motions for summary judgment are not germane to this appeal, as the court did not rule upon them. On July 22, 2008, the trial court filed a document indicating that the court would rule on the motions for summary judgment without a hearing and giving the parties 3 days to file any written arguments. Thereafter, on July 25, 2008, the trial court issued a letter ruling granting Sherman's original motion for partial summary judgment and second motion for partial summary judgment. On August 12, 2008, the trial court entered an order sustaining Sherman's first motion for partial summary judgment finding that the "best efforts" clause in paragraph 16 of the "Option 1" agreement and paragraph 15 of the "Option 2" agreement are

---

[4] Further reference to the Texas Business & Commerce Code will be by reference to "§ ___."

6

unenforceable. Therefore, since Taft's waiver and forfeiture defenses, were premised on these clauses, summary judgment was proper. The same day, the trial court entered an order simply granting Sherman's second motion for summary judgment relating to Taft's defense of fraudulent inducement. The trial court conducted a bench trial on the remaining issues and rendered judgment for Sherman on the issues, including an award of attorney's fees. It is from the rulings on the motions for partial summary judgment and the final judgment that Taft appeals.

On appeal, Taft contends that the trial court committed reversible error by granting the two motions for partial summary judgment and entering a final judgment for Sherman because there were material issues of fact regarding Taft's fraudulent inducement claim.[5]

Standard of Review

Appellate courts review the granting of a motion for summary judgment *de novo*. See Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). The movant in a motion for summary judgment, filed pursuant to rule 166a(c), has the burden of showing that no genuine issue of material fact exists and that it is entitled to a summary judgment as a matter of law. See Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997). The trial court must indulge every reasonable inference in favor of the non-movant and resolve all doubts in his favor. Id.

_____

[5] While Taft's appellate issue challenges both partial summary judgment rulings and the trial court's final judgment, Taft's brief challenges these rulings only in relation to his fraudulent inducement defense.

First Motion for Partial Summary Judgment

Conspicuously absent from Taft's appeal is an issue contesting the trial court's ruling regarding the defense of waiver and forfeiture pled in Taft's original answer. Inasmuch as appellant has not brought forth briefing or argument regarding the first motion for partial summary judgment, we must conclude that any error in the ruling has been waived. See Tex. R. App. P 38.1(i). The trial court's judgment regarding the first motion for partial summary judgment is affirmed.

Second Motion for Partial Summary Judgment

Sherman's second motion for partial summary judgment was predicated upon the proposition that Taft could not prove justifiable reliance upon any alleged promise and that the alleged oral promises violate the statute of frauds. See § 26.01(a)(1), (b)(5). Taft presents his fraud in the inducement claim as a defense to the request for specific performance as to the "Option 1" contract.

Fraud in the inducement is a species of fraud that arises only in the context of a contract. See Hasse v. Glazner, 62 S.W.3d 795, 798 (Tex. 2001). The elements of fraud in the inducement, as applied to this case are: 1) Sherman made a material misrepresentation that was false, 2) Sherman knew the representation was false when made or made it recklessly as a positive assertion without any knowledge of its truth, 3) Sherman intended to induce Taft to act upon the representation, and 4) Taft actually and justifiably relied upon the representation, and thereby, suffered injury. See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001). While Ernst & Young

8

was a traditional fraud case, these elements have been cited as the elements for fraud in the inducement. See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A., 112 S.W.3d 854, 858 (Tex.App.–Houston [14th Dist. ] 2003, pet. denied).

As applied to Sherman's second motion for partial summary judgment, Sherman contends that, as a matter of law, Taft could not have justifiably relied upon the alleged misrepresentation. See Ernst & Young, 51 S.W.3d at 577. In connection with the foregoing issue, it should be remembered that, when a party is involved in an arms-length transaction, he must exercise ordinary care and reasonable diligence for the protection of his own interests. See Thigpen v. Locke, 363 S.W.2d 247, 251 (Tex. 1962).

Taft's summary judgment proof consisted of his testimony that, from the first time he talked to his mother about the proposed sale to Sherman, they had always intended to lease back the farms. Further, Taft testified that Sherman had a hand-shake deal that Taft would be allowed to farm the option properties for 20 years. Putting this testimony in the chronology of events, the record supports that the hand-shake deal was after Scott entered into the sale to Taft that Sherman funded. Nothing was mentioned in any of the documents presented before the trial court about this being, in any way, a condition or term of that sale. Further, Taft testified that he could not recall whether or not the hand-shake deal was before or after the letter of intent was executed. Taft was certain that the hand-shake deal was before either of the option contracts were executed.

At this point, it is good to recall who drafted which documents. The record reflects that the letter of intent was prepared by the real estate broker involved in the transaction.

However, the option contracts at issue were prepared by Taft's attorney. Taft testified that he specifically wanted the language of paragraph 16 of the "Option 1" contract included. This language is as follows: "The parties will use their best efforts to negotiate concerning a feed supply agreement pertaining to the First Option Property and the Second Option Property and/or a lease agreement or agreement for custom farming."

What we are left with is a record where one party claims that he was fraudulently induced to enter into a contract to sell real property based upon a representation that he would, after the sale, be allowed to farm the land in question for 20 years. Yet, the alleged representation came after he signed a letter of intent saying that the parties would use their "best efforts to negotiate" the very subject of the alleged representation. Even with this language present and after the alleged oral promises were made, Taft signed two contracts that contain the "best efforts to negotiate" language. This language is in direct contravention to the alleged oral promises. When oral promises are directly contradicted by express, unambiguous terms of a written agreement, the law says that reliance on those oral promises is not justified. See DRC Parts, 112 S.W.3d at 858. Since the affirmative defense of fraud in the inducement contains an element requiring that the reliance on the alleged material false statement be justified, the trial court was correct to grant the second partial summary judgment.

Taft contends that the case of Formosa controls and would require this court to overturn the trial court's ruling regarding his affirmative defense of fraud in the inducement. According to Taft, since both Donald Sherman and Richard Avila testified that they never intended to enter into a lease agreement with Taft, this was an oral promise made with no

10

intention of performing. See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 46 (Tex. 1998). Taft's reliance on Formosa is misplaced. First, Formosa did not discuss the requirement of the reliance on the oral promise being justifiable. Second, when the factual construct of Formosa is considered, we find that the offending company had included some very specific representations in its bid packages. The contract executed made no reference to those representations. Here, however, the option contracts executed contained specific and unambiguous statements that directly contradicted the alleged oral promises. The record before us indicates that the inclusion of the language in the option contracts was at the insistence of Taft and, therefore, it appears that Taft failed to exercise ordinary care and reasonable diligence for the protection of his own interests. See Thigpen, 363 S.W.2d at 251. Therefore, we do not find Formosa to be controlling.

Accordingly, we overrule Taft's issue on appeal.

Conclusion

Having overruled Taft's issue on appeal, we affirm the judgment of the trial court.


Mackey K. Hancock
Justice


11