# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 5, 2021

Lyle W. Cayce
Clerk

No. 20-10377

Bᴉɴʜ Hᴏᴀ Lᴇ,

*Plaintiff—Appellant*,

*versus*

Exᴇᴛᴇʀ Fɪɴᴀɴᴄᴇ Cᴏʀᴘᴏʀᴀᴛɪᴏɴ; Eɴᴢᴏ Pᴀʀᴇɴᴛ, L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:15-CV-3839

Before Kɪɴɢ, Eʟʀᴏᴅ, and Wɪʟʟᴇᴛᴛ, *Circuit Judges*.
Dᴏɴ R. Wɪʟʟᴇᴛᴛ, *Circuit Judge*:

After being fired, Bihn Hoa Le sued Exeter Finance Corporation and Exeter's parent company, Enzo Parent, L.L.C, for breach of contract, fraud, and *quantum meruit*. The district court granted summary judgment for Exeter. On appeal, Le argues that the district court improperly excluded certain evidence and erred in granting summary judgment against him. On

No. 20-10377

this record—three-quarters of which is troublingly sealed from the public—we AFFIRM summary judgment in favor of Exeter.[1]

I

After leaving a previous employer, Lennox, Le began working for Exeter as the Chief Human Resources Officer and Executive Vice President. When Exeter hired him, Le signed an Employment Agreement that contemplated he would have the option to enter a severance and non-compete agreement. Le was later presented with such an agreement but did not sign it.

At Exeter, Le participated in an Executive Team profits interest pool, which entitled him to compensation in the form of Profits Interest Units (PIUs)—that is, an equity interest in Enzo (Exeter's parent company). Approximately eight months after Le started working at Exeter, he executed a PIU Agreement and received PIUs. The PIU Agreement provided that the board would conclusively determine the fair market value of PIUs in the event of a call.

Exeter fired Le after eighteen months. At this point, Enzo provided Le with a call notice, seeking to exercise the option to purchase Le's earned PIUs. The board determined that the fair market value of the PIUs was $0.00.

Le sued Exeter in state court for breach of contract, fraudulent inducement, *quantum meruit*, violations of the Texas Commission on Human Rights Act, and violations of federal law. Exeter removed the case to federal court. Following prolonged litigation and discovery disputes, Exeter moved

---

[1] Judge King concurs in the judgment.

No. 20-10377

for summary judgment. The district court resolved several pending motions and granted summary judgment for Exeter on all claims.

## II

Le timely raises two issues on appeal. First, Le argues that the district court abused its discretion by excluding certain evidence. Second, Le argues that the district court erred in granting summary judgment against him on his contract, fraudulent inducement, and *quantum meruit* claims. We disagree.

### A. Excluded Evidence

Le contends the district court improperly excluded evidence in two ways: (1) by denying a continuance to resolve discovery disputes over audit reports; and (2) by declining to consider Le's filings and evidence that supplemented his response in opposition to summary judgment.

Le first challenges the district court's denial of his motion to continue summary-judgment deadlines. This denial effectively precluded Le's use of a set of financial audit reports. Every year, Duff & Phelps, an outside accounting firm, independently audited the PIUs and ascribed some value to them; the value of the PIUs and the reports, to the extent they reflect that value, are at the core of this dispute.

We review a district court's ruling on a motion for a continuance for abuse of discretion.[2] "When a party requests a continuance of a summary judgment motion to conduct discovery, the moving party must . . . (1) 'demonstrat[e] . . . specifically how the requested discovery pertains to the pending motion,' and (2) 'diligently pursue relevant

---

[2] *Cf. Resolution Tr. Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d 1398, 1401 (5th Cir. 1993).

No. 20-10377

discovery.'"[3] As to the first requirement, the party must explain "*how* the additional discovery will create a genuine issue of material fact."[4]

The district court concluded that Le did not demonstrate the second requirement because he failed to diligently pursue discovery within the relevant deadlines. Specifically, Le moved to continue based on a lingering discovery dispute that arose *after* the court-ordered discovery deadline. Granting this untimely motion would, the district court explained, "violate[] the court's prohibition against such continuances." The district court then assessed the first requirement (though Le had already flunked the second) by considering whether the Duff & Phelps audit reports would have affected the summary-judgment analysis. The analysis would not have changed, the court concluded, because the reports did not create a genuine dispute of material fact.

We agree. The PIU Agreement assigns to the board of directors the task of determining the fair market value of PIUs at the time of a call. The Duff & Phelps audit reports indicate that their PIU valuations rely on methods and dates tailored to the limited financial-reporting purpose of the reports. The reports do not provide a valuation of the PIUs using the methods or dates required by the PIU Agreement. Therefore, on the record before us, the audit reports do not create a genuine dispute of material fact as to the PIUs' value under the PIU Agreement's terms.[5] The district court

---

[3] *Campbell Harrison & Dagley, L.L.P. v. PBL Multi-Strategy Fund, L.P.*, 744 F. App'x 192, 197 (5th Cir. 2018) (quoting *Wichita Falls Off. Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992)).

[4] *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993).

[5] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that evidence that is "merely colorable," "or is not significantly probative," does not preclude summary judgment (citations omitted)).

No. 20-10377

did not abuse its discretion in denying the motion for a continuance.[6] Le's challenge based on the exclusion of the Duff & Phelps audit reports fails.

Next, Le challenges the district court's exclusion of filings and evidence to supplement his response in opposition to summary judgment, pointing to a case stating that courts shouldn't summarily exclude relevant evidence that doesn't unfairly prejudice the opposing party. But Le does not specify which of his many supplemental filings the district court should have considered. And Le does not explain what legal standard the district court violated by declining to do so. When a party pursues an argument on appeal but does not analyze relevant legal authority, the party abandons that argument.[7] Le has not identified the relevant legal standards, nor has he pointed us in the direction of any relevant Fifth Circuit cases. Accordingly, Le has abandoned his remaining arguments challenging the exclusion of his evidence.

## B.  *Summary Judgment*

Next, Le asks us to reverse summary judgment against him on his claims for breach of contract, fraudulent inducement, and *quantum meruit*.

We review de novo a district court's grant of summary judgment, applying the same standards as the district court. Our inquiry is limited to the

---

[6] *See Campbell Harrison*, 744 F. App'x at 198; *Krim*, 989 F.2d at 1443.

[7] *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 489 n.1 (5th Cir. 2018) (failure to adequately brief an argument forfeits the claim on appeal); *Willis v. Cleco Corp.*, 749 F.3d 314, 318 n.3 (5th Cir. 2014) (disregarding an argument "giv[ing] scant, if not conclusory attention to the record: citations are minimal, and legal analysis relating facts to the law is largely absent"); *United States v. Torres-Aguilar*, 352 F.3d 934, 936 n.2 (5th Cir. 2003) (abandoned argument was "only briefly mention[ed] it in a footnote of [the] opening brief without providing any legal citation or analysis"). *See also* Fed. R. App. P. 28(a)(8).

No. 20-10377

summary-judgment record, and new theories not raised before the district court may not be advanced for the first time on appeal.[8]

### 1. *Breach of Contract*

Le presents two breach-of-contract theories: (1) that Exeter breached the PIU Agreement when it called his vested equity at $0.00; and (2) that Exeter breached a severance agreement by terminating him.

The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[9]

Le's first contract claim, based on the PIU Agreement, is premised on the fact that the board ascribed a value of $0.00 to his PIUs on the call date. But this was the board's prerogative under the contract. As Le acknowledged before the district court, the board was "entitled to call the PIUs, and the valuation of those PIUs is governed by the PIU Agreement's method for calculating the fair market value of his PIUs." Le points to the non-zero PIU projected values in 2013 when he was hired, and to non-zero PIU values from subsequent Duff & Phelps audit reports. But neither has any bearing on whether the board properly determined the fair market value of Le's PIUs at the time of the call. The PIU Agreement demands a valuation using specific methods and dates. Le cannot demonstrate that the board improperly valued his PIUs by setting forth evidence that uses the wrong methods and dates. Because, on this record, there is no evidence that

---

[8] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1071 n.1 (5th Cir. 1994).

[9] *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (applying Texas law and citing *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

the board did anything but value the PIUs pursuant to the terms of the PIU Agreement, there is no evidence of breach. And so, the district court correctly concluded that Le's contract claim, based on the PIU Agreement, fails as a matter of law.

For his second claim, Le says that a severance agreement was formed when he signed Exeter's Employment Agreement and that his termination constitutes a breach of this severance agreement. But Le's Employment Agreement indicated that he would *later* have the option of entering a severance and non-compete agreement. Indeed, he later had that option, but he declined to sign the severance agreement that was offered to him. Therefore, no severance agreement was ever fully formed. Under the terms of the Employment Agreement, the parties had nothing more than an "unenforceable agreement to agree" as to the severance.[10] The district court correctly concluded that, absent evidence of a valid severance agreement, Le's breach of contract claim fails as a matter of law.

### 2. *Fraudulent Inducement*

We turn now to Le's fraudulent inducement claims. Insofar as Le argues that he was fraudulently induced to enter into a severance agreement, no severance agreement was ever formed, as explained above. Le could not have been fraudulently induced to enter into a nonexistent agreement.[11]

---

[10] *Musallam v. Ali*, 560 S.W.3d 636, 639 (Tex. 2018); *see also Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("If an agreement to make a future agreement is not sufficiently definite as to all of the future agreement's essential and material terms, the agreement to agree is nugatory." (quotation omitted)).

[11] *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001) ("Fraudulent inducement . . . is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof.").

No. 20-10377

Likewise, we reject Le's contention that he was fraudulently induced to join Exeter based on misrepresentations as to the PIUs' projected value. Under Texas law, a plaintiff claiming fraud in the inducement must show: (1) the defendant knowingly or recklessly made a material representation; (2) the representation was false; (3) the defendant intended the plaintiff to act on the representation; (4) the plaintiff actually and justifiably relied on the representation; and (5) the plaintiff thereby suffered an injury.[12]

As the district court concluded, the undisputed record evidence shows that Le did not rely on Exeter's representations as to the PIUs' projected value when he decided to join the company. Whatever Le now says he relied on, the record contains ample evidence that Le himself believed that PIUs were inherently risky; for instance, Le stated that the PIU opportunity sounded "outlandish." The record evidence does not give rise to a genuine dispute as to whether Le, a sophisticated party who understood the volatility of PIUs, actually—much less justifiably—relied on the representations that form the basis of his fraud claim.[13] The district court properly adjudicated Le's fraud claims as a matter of law.

### 3.   Quantum Meruit

Last, we address Le's contention that, in lieu of recovering on a contract theory, he was entitled to recover promised pay in the form of

---

[12] *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010); *Taft v. Sherman*, 301 S.W.3d 452, 457 (Tex. App.—Amarillo 2009, no pet.) (fraud in the inducement).

[13] *See Grant*, 314 S.W.3d at 923 (explaining that "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts . . . it is extremely unlikely that there is actual reliance on the plaintiff's part").

severance under a *quantum meruit* theory. The district court concluded that Le acted with unclean hands, foreclosing equitable relief. We agree.

*Quantum meruit* is an equitable theory of recovery based on an implied agreement to pay for benefits received.[14] "[T]he doctrine of 'unclean hands' allows a court to 'refuse to grant equitable relief . . . sought by one whose conduct in connection with the same matter or transaction has . . . violated the principles of equity and righteous dealing.' "[15]

The district court's unclean hands determination turns on whether Le misrepresented his relationship with his previous employer, Lennox, when negotiating his employment with Exeter. The record establishes that Le made statements referencing his employment with Lennox that were not true. Therefore, the district court correctly determined that Le's conduct in connection with the transactions before the court was inequitable, precluding any equitable remedy.

### III

Having decided the substantive issues, we hasten to add a peripheral-yet-essential point: Judicial records are public records. And public records, by definition, presume public access.

In this case, the district court granted an agreed protective order, authorizing the sealing, in perpetuity, of any documents that the parties *themselves* labeled confidential. Result: nearly three-quarters of the record—

---

[14] *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

[15] *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invs., LLC*, 481 S.W.3d 336, 351 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (quoting *Park v. Escalera Ranch Owners' Ass'n, Inc.*, 457 S.W.3d 571, 597 (Tex. App.—Austin 2015, no pet.)).

3,202 of 4,391 pages—is hidden from public view, for no discernable reason other than both parties wanted it that way.

The public deserves better. The presumption of openness is Law 101: "The public's right of access to judicial records is a fundamental element of the rule of law."[16] Openness is also Civics 101. The Constitution's first three words make clear that ultimate sovereignty is wielded not by government but by the governed.[17] And because "We the People" are not meant to be bystanders, the default expectation is transparency—that what happens in the halls of government happens in public view. Americans cannot keep a watchful eye, either in capitols or in courthouses, if they are wearing blindfolds.

"Providing public access to judicial records is the duty and responsibility of the Judicial Branch."[18] Why is this important? Because accessibility enhances legitimacy, the assurance that things are on the level. Article III courts are independent, and it is "particularly *because* they are independent" that the access presumption is so vital—it gives the federal judiciary "a measure of accountability," in turn giving the public "confidence in the administration of justice."[19] Put simply, protecting the public's right of access is "important to maintaining the integrity and

---

[16] *In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*, 964 F.3d 1121, 1123 (D.C. Cir. 2020).

[17] *Collins v. Mnuchin*, 938 F.3d 553, 562 (5th Cir. 2019) (en banc), *cert. granted*, 141 S. Ct. 193 (2020) ("No mere tinkerers, the Founders' upended things. Three rival branches deriving power from three unrivaled words—'We the People'—inscribed on the page in supersize script. In an era of kings and sultans, nothing was more audacious than the Preamble's first three words, a script-flipping declaration that ultimate sovereignty resides not in the government but in the governed.").

[18] *Leopold*, 964 F.3d at 1134.

[19] *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (emphasis added).

No. 20-10377

legitimacy of an independent Judicial Branch."[20] And hopefully, more access to judicial records means more trust in judicial officers and more respect for judicial orders.

Judicial records belong to the American people; they are public, not private, documents. Certainly, some cases involve sensitive information that, if disclosed, could endanger lives or threaten national security. But increasingly, courts are sealing documents in run-of-the-mill cases where the parties simply prefer to keep things under wraps.

This is such a case. The secrecy is consensual, and neither party frets that 73 percent of the record is sealed. But we do, for three reasons. First, courts are duty-bound to protect public access to judicial proceedings and records. Second, that duty is easy to overlook in stipulated sealings like this one, where the parties agree, the busy district court accommodates, and nobody is left in the courtroom to question whether the decision satisfied the substantive requirements. Third, this case is not unique, but consistent with the growing practice of parties agreeing to private discovery and presuming that whatever satisfies the lenient protective-order standard will necessarily satisfy the stringent sealing-order standard.[21] Below, we review the interests at stake and the exacting standard for sealing that protects those interests. Then, we explain the concerns raised by the sealings in this case.

\*　　　\*　　　\*

---

[20] *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 663 (D.C. Cir. 2017).

[21] *See* Seth Katsuya Endo, *Contracting for Confidential Discovery*, 53 U.C. Davis L. Rev. 1249, 1283 (2020) (collecting empirical data wherein most agreed sealing orders fell short of the substantive requirements to seal).

No. 20-10377

The public's right of access to judicial proceedings is fundamental. The principle traces back to Roman law, where trials were *res publica*—public affairs.[22] Public access was similarly fundamental to English common law. Seventeenth-century English jurist Sir Edward Coke explained that "all Causes ought to be heard, ordered, and determined before the Judges of the King's Courts openly in the King's Courts, *wither all persons may resort*."[23] A century or so later, English philosopher and judge Jeremy Bentham observed, "Publicity is the very soul of justice."[24]

In this tradition, American judicial proceedings are public.[25] And judges must protect public accessibility for three mutually reinforcing reasons: (1) the public has a right to monitor the exercise of judicial authority;[26] (2) judges are "the primary representative[s] of the public interest in the judicial process";[27] and (3) the judiciary's institutional legitimacy depends on public trust. Public trust cannot coexist with a system

---

[22] David S. Ardia, *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835, 843 (2017) (citing Bruce W. Frier, The Rise of the Roman Jurists: Studies In Cicero's Pro Caecina 57 (1985) ("[T]he Urban Praetor's court was set up in the open air at the southeastern end of the Forum . . . .")).

[23] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 565 n.6 (1980) (quoting 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681)).

[24] Jeremy Bentham, *Draught For The Organization Of Judicial Establishments*, in 4 The Works of Jeremy Bentham (John Bowring ed., Edinburgh, William Tait, 1838–43), *available at* https://oll.libertyfund.org/title/bowring-the-works-of-jeremy-bentham-vol-4#lf0872-04_head_164.

[25] *Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992) (Easterbrook, J.).

[26] *See Bradley on behalf of AJW v. Ackal*, 954 F.3d 216, 224 (5th Cir. 2020) ("The public 'has a common law right to inspect and copy judicial records.'"); *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) (Posner, J.) ("[T]he public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding.").

[27] *Citizens*, 178 F.3d at 945.

12

wherein "important judicial decisions are made behind closed doors" and, worse, private litigants do the closing.[28]

In our view, courts should be ungenerous with their discretion to seal judicial records,[29] which plays out in two legal standards relevant here. The first standard, requiring only "good cause," applies to protective orders sealing documents produced in discovery.[30] The second standard, a stricter balancing test, applies "[o]nce a document is filed on the public record" — when a document "becomes a 'judicial record.'"[31] Under both standards, the working presumption is that judicial records should not be sealed.[32] That must be the default because the opposite would be unworkable: "With

---

[28] *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 450 (5th Cir. 2019) (quoting *United States v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 690 (5th Cir. 2010)); *accord Bradley*, 954 F.3d at 224 (public access to judicial records "promotes the trustworthiness of the judicial process, curbs judicial abuses, and provides the public with a better understanding of the judicial process, including its fairness[, and] serves as a check on the integrity of the system" (quoting *United States v. Sealed Search Warrants*, 868 F.3d 385, 395 (5th Cir. 2017)).

[29] *Holy Land*, 624 F.3d at 690 ("[T]he power to seal court records must be used sparingly in light of the public's right to access."); *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) ("[T]he district court's discretion to seal the record of judicial proceedings is to be exercised charily." (quotation omitted)).

[30] *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 684 (5th Cir. 1985) (discussing Fed. R. Civ. P. 26); Fed. R. Civ. P. 26 (c)(1) (requiring good cause for sealing discovery documents). *See also* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 433 (1991) (describing good cause as a "particularized factual showing of the harm" to be avoided by sealing).

[31] *Vantage*, 913 F.3d at 451. One explanation of the different sealing standards for discovery and judicial records is that "material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312 (11th Cir. 2001). *Accord* Endo, *supra* n.21, at 1283 (dispositive filings generally subject to a more stringent sealing standard than discovery documents).

[32] *Vantage*, 913 F.3d at 450.

No. 20-10377

automatic sealing, the public may never know a document has been filed that might be of interest."[33]

True, even under the stricter balancing standard, litigants sometimes have good reasons to file documents (or portions of them) under seal, such as protecting trade secrets or the identities of confidential informants. But "[m]ost litigants have no incentive to protect the public's right of access."[34] That's why "judges, not litigants"[35] must undertake a case-by-case, "document-by-document," "line-by-line" balancing of "the public's common law right of access against the interests favoring nondisclosure."[36] Sealings must be explained at "a level of detail that will allow for this Court's review."[37] And a court abuses its discretion if it "ma[kes] no mention of the presumption in favor of the public's access to judicial records" and fails to "articulate any reasons that would support sealing."[38]

Here, there is no separate sealing order at all. There is only the protective order entered for purposes of "discovery in this matter." That order granted the parties wide latitude to designate "Confidential" any

---

[33] Gregg Costa, *Federal Appellate Judge: Too Many Sealed Documents*, Nat'l Law J. (Feb. 15, 2016, 12:00 AM), https://www.law.com/nationallawjournal/almID/1202749628845/Federal-Appellate-Judge-Too-Many-Sealed-Documents/?rss=rss_nlj (describing the crucial role of unsealed court documents in the Boston Globe exposé of the cover-up of sexual abuse by Catholic priests).

[34] *BP Expl. & Prod., Inc. v. Claimant ID 100246928*, 920 F.3d 209, 211 (5th Cir. 2019).

[35] *Id.*

[36] *Sealed Search Warrants*, 868 F.3d at 390 (case-specific approach (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978)); *Vantage*, 913 F.3d at 451; *Bradley*, 954 F.3d at 225 (quoting *Van Waeyenberghe*, 990 F.2d at 850).

[37] *Sealed Search Warrants*, 868 F.3d at 397.

[38] *Van Waeyenberghe*, 990 F.2d at 849. In our court, although we sometimes allow information to be sealed, we may require parties to file a redacted copy for the public.

information they believed in good faith was "not generally known" and would ordinarily be revealed in confidence or not at all. In addition, if confidential information appeared "in any affidavits, briefs, memoranda of law or other papers filed in court in this action," the *entire document* was filed under seal.[39] Not only that, the order "survive[s] the final termination of this action." In other words, the parties decided unilaterally what judicial records to keep secret, and their decision was permanent; once sealed, the records would stay that way.

And because there is no sealing order, there is no sealing analysis—no reasons given, no authorities cited, no document-by-document inquiry. Instead, the parties wielded nigh-boundless discretion to label things confidential. And again, the secrecy they granted is "perpetual" and "wholesale."[40] Perhaps most disquieting, documents marked confidential provided the basis for summary judgment—a dispositive order adjudicating the litigants' substantive rights (essentially a substitute for trial)—yet there was "no mention of the presumption in favor of the public's access to judicial records."[41] There was no grappling with public and private interests, no

---

[39] Practically speaking, this provision of the parties' agreed protective order doubles as the court's sealing order. It authorizes sealing for "all documents and all transcripts of deposition testimony," labeled confidential "in whole or in part," "including all pleadings, deposition transcripts, exhibits, discovery responses or memoranda purporting to reproduce or paraphrase such information."

[40] *Krynicki*, 983 F.2d at 77 (perpetual); *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir. 1989) (rejecting "wholesale sealing"); *In re Providence Journal Co., Inc.*, 293 F.3d 1, 15 (1st Cir. 2002) (citing *United States v. Biaggi*, 828 F.2d 110, 116 (2d Cir. 1987) (same)); *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993) (same).

[41] *Van Waeyenberghe*, 990 F.2d at 849. *See also* Laurie Kratky Dore, *Secrecy by Consent: The Use and Limits of Confidentiality in the Pursuit of Settlement*, 74 NOTRE DAME L. REV. 283, 375 (1999) ("[M]aterials used by a court in granting summary judgment, a dispositive motion that adjudicates the legal merits of a case and that essentially substitutes for trial, present the clearest example of judicial records presumptively subject to public scrutiny."). Whatever its relevance in this case, the good-cause standard would not justify

consideration of less drastic alternatives. There was no assurance that the extent of sealing was congruent to the need.[42]

At the *discovery* stage, when parties are exchanging information, a stipulated protective order under Rule 26(c) may well be proper. Party-agreed secrecy has its place—for example, honoring legitimate privacy interests and facilitating the efficient exchange of information.[43] But at the *adjudicative* stage, when materials enter the court record, the standard for shielding records from public view is far more arduous. This conflation error—equating the standard for keeping unfiled discovery confidential with the standard for placing filed materials under seal—is a common one and one that over-privileges secrecy and devalues transparency.

Given the judiciary's solemn duty to promote judicial transparency, we must be alert to conflation errors (extending protective-order standards to material filed with the court).[44] The secrecy of judicial records, including stipulated secrecy, must be justified and weighed against the presumption of

---

sealing documents filed on the record in support of summary judgment. *Vantage*, 913 F.3d at 451. *Accord Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 307 (6th Cir. 2016) (Kethledge, J.) (sealing abused discretion where "the parties and the district court plainly conflated the standards for entering a protective order under Rule 26 with the vastly more demanding standards for sealing off judicial records from public view"). Equating the discovery and judicial-record sealing standards appears to be a troublingly common error. *See* Endo, *supra* n.21, at 1254 (empirical data showing frequent conflation of the standard to seal records with the standard for confidential discovery).

[42] *E.g.*, *In re Gee*, No. 19-30953, slip op. at 6–7 (5th Cir. Nov. 27, 2019) (Elrod, J., concurring) (noting failure to "grapple with the general incongruity of sealing a *New York Times* Op-Ed," failure to consider redaction instead of sealing, and failure to provide any legal reasons to seal).

[43] Endo, *supra* n.21, at 1262.

[44] *E.g.*, *In re Gee*, slip op. at 6–7 (Elrod, J., concurring) (expressing concern over extensive sealings without legal reasoning and without acknowledging the presumption of public access).

openness that can be rebutted only by compelling countervailing interests favoring nondisclosure. All too often, judicial records are sealed without any showing that secrecy is warranted or why the public's presumptive right of access is subordinated. This mistake harms the public interest, however interested the public is likely to be. Sealings are no less rampant in low-profile cases (like this one) than in high-profile cases featured on the front page (like Bill Cosby's deposition testimony) or the Oscars stage (like records detailing the cover-up of child sexual abuse, as depicted in 2016 Best Picture Winner *Spotlight*).[45] And a steady flow of unjustified low-profile sealings is capable of far greater damage—a gradual, sub silentio erosion of public access to the judiciary, erosion that occurs with such drop-by-drop gentleness as to be imperceptible.

*     *     *

The Judicial Branch belongs to the American people. And our processes should facilitate public scrutiny rather than frustrate it. Excessive secrecy—particularly displacing the high bar for sealing orders with the low bar for protective orders—undercuts the public's right of access and thus undermines the public's faith in our justice system.

Legal arguments, and the documents underlying them, belong in the public domain. American courts are not private tribunals summoned to resolve disputes confidentially at taxpayer expense.[46] When it comes to protecting the right of access, the judge is the public interest's principal

---

[45] *See* Costa, *supra* note 33.

[46] *Accord BP Expl.*, 920 F.3d at 212 ("As is its right, Claimant ID 100246928 has used the federal courts in its attempt to obtain millions of dollars it believes BP owes because of the oil spill. But it should not able to benefit from this public resource while treating it like a private tribunal when there is no good reason to do so.").

champion. And when the parties are mutually interested in secrecy, the judge is its *only* champion.

To be sure, entrenched litigation practices harden over time, including overbroad sealing practices that shield judicial records from public view for unconvincing (or unarticulated) reasons. Such stipulated sealings are not uncommon. But they are often unjustified. With great respect, we urge litigants and our judicial colleagues to zealously guard the public's right of access to judicial records—*their* judicial records—so "that justice may not be done in a corner." [47]

## IV

For the reasons discussed in Part II, summary judgment is AFFIRMED.

---

[47] New Jersey Provincial Charter ch. 23, July 29, 1674, *reprinted in* 5 Francis Newton Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 2551 (1909).